No. 79,384

RAYMOND F. STANSBURY, *Appellee/Cross-Appellant,* v. ROBERT D. HANNIGAN, *et al., Appellants/Cross-Appellees.*

(960 P.2d 227)

Opinion filed June 5, 1998.

*Jeff Cowger*, special assistant attorney general, and *Carla J. Stovall*, attorney general, were on the briefs for appellants/cross-appellees.

*Raymond F. Stansbury*, appellee/cross-appellant, was on the briefs pro se.

The opinion of the court was delivered by

DAVIS, J.: This appeal by the Department of Corrections and cross-appeal by the petitioner inmate involve two questions. The first question is whether the withholding of good time credits from the petitioner under regulations amended after the petitioner's crime was committed violated the Ex Post Facto Clause of the United States Constitution. The second question is whether internal management policies adopted after the petitioner's sentence, resulting in his loss of privileges, violates the petitioner's due process rights under the United States Constitution. Both matters are questions of first impression before this court. We transferred this case from the Court of Appeals. Our jurisdiction is based upon K.S.A. 20-3017 and K.S.A. 60-2101(b).

The petitioner was tried by jury and convicted on May 10, 1991, of the charge of rape, which arose out of circumstances occurring on September 9, 1990. He was sentenced to the Secretary of Corrections for a term of 10 to 20 years. He began serving his indeterminate sentence on May 18, 1991.

Prior to April 1994, the petitioner earned 100% of his authorized good time credits by remaining free of any prison offenses and by the discretionary grant of good time credits by the unit team manager. See K.A.R. 44-6-124 (1989). After April 1994, based upon the 1993 amendment to K.A.R. 44-6-124, 100% of the petitioner's potential good time credits (120 days) were withheld for his failure

to sign an amended Sex Abuse Treatment Program (SATP) agreement. In August 1994, another 120 days of good time credits were withheld. Sixty days of good time credits were withheld in April 1995, and 120 days more were withheld in October 1995. In January 1996, 120 days of good time credits were again withheld.

Before the adoption of Internal Management Policies and Procedures (IMPP) 11-101 in 1996, the petitioner was entitled and had certain privileges during his incarceration, including but not limited to, the following: ownership and possession of a personal television and handicrafts, use of outside funds, canteen expenditures up to $140 a month, approved visitors, and incentive pay. After the adoption of IMPP 11-101, inmates were required to earn these privileges by generally remaining free of offenses and demonstrating a willingness to participate in recommended programs including, in the petitioner's case, the SATP. Based upon the petitioner's refusal to participate in SATP, he was placed at IMPP 11-101 Level I. At this level he was no longer allowed a personal television but did have access to general television, canteen expenditures were limited to $20 per month, incentive pay was reduced, and visitors were limited to immediate family.

After exhausting his administrative remedies, the petitioner filed a petition for writ of habeas corpus. He contended that the application of the 1993 amendment to K.A.R. 44-6-124 to him constituted an ex post facto violation and violated due process and that the withholding of good time credits based on his failure to comply with the SATP violated his Fifth Amendment rights. He also contended that the change in his prison conditions and loss of privileges as the result of his classification under IMPP 11-101, constituted a violation of the Ex Post Facto Clause of the United States Constitution.

The trial court narrowed the issues in pretrial conference to the following: the alleged Fifth Amendment violation, the ex post facto nature of the 1993 amendment to K.A.R. 44-6-124, the ex post facto nature of the application of the IMPP 11-101 system, and a claim that the actions of the respondents violated the Eighth Amendment.

The trial court held that the 1993 amendment to K.A.R. 44-6-124(g)(6), as applied to the petitioner who was sentenced in 1991, was an ex post facto law and void under the United States Constitution. The trial court denied any further relief. The Department of Corrections with other named respondents appeal, and the petitioner cross-appeals. For the reasons set forth below, we affirm the trial court.

There are two aspects of this appeal. The first aspect involves good time credits under state statutes and the Kansas Administrative Regulations. The Department of Corrections appeals the trial court's determination that the 1993 amendment to K.A.R. 44-6-124(g)(6), as applied to the petitioner, is an ex post facto law. The petitioner cross-appeals, contending that the 1993 amendment violated his due process rights and that the trial court erred in determining that the withholding of good time credits for the petitioner's failure to participate in the SATP did not violate his rights under the Fifth Amendment to the United States Constitution.

The second aspect of this appeal involves IMPP 11-101, adopted by the Department of Corrections in 1996 and applied to the petitioner, who was convicted and sentenced in 1991. The petitioner contended before the trial court that such application was ex post facto, although he has abandoned this claim on appeal. For the first time on appeal, he contends that application of the IMPP violates his due process rights. We consider this an important constitutional issue and elect to treat his contention even though he failed to address the matter before the trial court. See *State v. Bell*, 258 Kan. 123, 126, 899 P.2d 1000 (1995).

## Good Time Credits

In Kansas, the award of good time credits is authorized by law. See K.S.A. 21-4722; K.S.A. 22-3725. The manner in which such credits are earned, awarded, forfeited, withheld, and accumulated by individual inmates is governed by duly authorized regulations adopted by the Department of Corrections. Good time credits serve a useful purpose within our penal system by providing incentives for good behavior and inmate participation in remedial

and rehabilitation programs, as well as sanctions for lack of performance and disobedience.

Two important dates are affected by the awarding, forfeiting, and withholding of good time credits. The first date is the date on which an inmate becomes eligible to be considered for parole. See K.S.A. 22-3717. The second date is the conditional release date, which is the date upon which an inmate is entitled to be released from incarceration. See K.S.A. 22-3718; *Beck v. Kansas Adult Authority*, 241 Kan. 13, 29-30, 735 P.2d 222 (1987).

### Parole Eligibility

K.A.R. 44-6-124 (1989), in effect when the petitioner was convicted, provided in pertinent part:

"For parole eligibility, award of good time credits shall be limited as follows:

"(1) Inmates with no class I offenses during the review period shall receive at least 50% of good time credits allocated for that period.

"(2) Inmates with no class I or II offenses during the review period shall receive at least 60% of the good time credits allocated for that period.

"(3) Inmates with no class I, II or III offenses during the review period shall receive at least 70% of the good time credits allocated for that period.

"(4) Inmates with no class I, II, III or IV offenses during the review period shall receive at least 80% of the good time credits allocated for that period.

"(5) The balance of the credits above the percentages listed in paragraphs (a)(1) to (a)(4) shall be awarded by the unit team based on factors of good work, behavior, and on other performance factors related to effective rehabilitation of the inmate."

The regulation further provided that the unit team had the discretion to refuse to award all or part of *that portion of credits for which it had discretion*, or 20% of the total available for cooperation or non-cooperation, including the inmate's nonparticipation in programs. K.A.R. 44-6-124(b) (1989).

According to the provisions of K.S.A. 22-3717(a), an inmate "shall be eligible for parole after serving the entire minimum sentence imposed by the court, less good time credits." Under the provisions of the regulation in effect at the time of the petitioner's conviction, good time credits earned were applied to the inmate's minimum sentence to determine the date he or she was eligible

for parole. The more good time credits earned, the earlier the inmate became eligible for parole. As indicated above, the petitioner in this case earned 100% of available good time credit until application of the 1993 amendment to K.A.R. 44-6-124 discussed below.

### Conditional Release Date

K.A.R. 44-6-108(c) (1989), which was also in effect when the petitioner was sentenced, stated in pertinent part that "[t]o establish the conditional release date, good time credits, not forfeited, *shall be presumed earned* and shall be applied to the maximum sentence term when first computed." (Emphasis added.) Thus, an inmate's conditional release date was computed based upon the presumption that he or she would earn all good time credits available under the system then in effect. These good time credits were then applied to the inmate's maximum sentence, thereby fixing the time the inmate was entitled to be released from incarceration, the inmate's conditional release date. Any forfeiture of good time credits because of institutional offenses after parole eligibility had been reached would result in the forfeited time being added to the inmate's conditional release date up to the maximum sentence, thereby extending the time the inmate would be incarcerated. See K.A.R. 44-6-125(b) (1989).

Thus, credits for parole eligibility had to be actually earned under the system as it existed at the time the petitioner was convicted, while good time credits for the conditional release date were awarded at the outset of his sentence. For the purposes of earning parole eligibility, an inmate with no class I offenses during the review period would receive at least 50% of the good time credits for that period. An inmate with no class I, II, III, or IV offenses was guaranteed to receive at least 80% of the allocated good time credits. The balance of the credits were discretionary and could be awarded or not awarded for a variety of reasons, including failure to constructively participate in a program. See K.A.R. 44-6-124(b) (1989).

In addition, the petitioner's conditional release date was set at the beginning of his sentence based upon the presumption that he

would earn all available good time credits authorized by 22-3725. See K.A.R. 44-6-108 (1989). As the respondents state in their brief on appeal, "[a]t the time of petitioner's crime, pursuant to K.S.A. 22-3725, he was entitled to have the opportunity to be able to earn a potential total of ten (10) years of good time credit off of his sentence." Thus, the petitioner's conditional release date was 10 years less than the maximum sentence of 20 years.

The 1993 amended version of K.A.R. 44-6-124(a) provided:

"For crimes, other than class A crimes, committed prior to July 1, 1993, an inmate may earn good time credits which shall be subtracted from the minimum sentence in order to establish a parole eligibility date or the maximum sentence in order to establish the conditional release date."

Moreover, K.A.R. 44-6-124(g) (1994) provided a marked change in awarding and withholding good time credits:

"(g) An inmate's disciplinary record shall affect the earning of good time awards in the following manner.

"(1) A guilty finding of a class I disciplinary offense shall result in the withholding of a minimum of 50% of the good time credits available for that program classification review period.

"(2) A guilty finding of a class II disciplinary offense shall result in the withholding of a minimum of 25% but not more than 50% of the good time credits available for that program classification review period.

"(3) A guilty finding of a class III disciplinary offense shall result in the withholding of a minimum of 10% but not more than 25% of the good time credits available for that program classification review period. . . .

. . . .

"(6) A pattern of refusal by an inmate to constructively work or participate in assigned programs *shall* result in the withholding of 100% of the good time credits for that program classification review period, unless the inmate is determined by the facility health authority to be physically or mentally incapable of working or participating in a particular program or detail." (Emphasis added.)

The effect of the change on the petitioner was substantial. The trial court illustrated this point by incorporating into its memorandum decision the authorities and ruling of its earlier decision on the same issue, wherein it stated:

"Under the prior regulations, an inmate without a disciplinary violation was automatically awarded 80% of the good time credits available for the review period with the remaining 20% left to the discretion of the unit team. Under the current regulations, an inmate without a disciplinary violation, could lose 100% of the

good time credit available because of failure to participate in a program; which is exactly the plight of the petitioner."

The plight of this petitioner is the same. He refused to participate in the SATP, and under the provisions of K.A.R. 44-6-124(g)(6), his failure to participate *"shall* [and did] result in the withholding of 100% of the good time credits for that program classification review period." (Emphasis added.) Under the system in effect when the petitioner was sentenced he, without offenses, was guaranteed 80% good time credits, while under the 1993 amendment, without offenses, 100% of his good time credits were withheld because of his failure to participate in the SATP. The change applied retrospectively, altering the method by which good time credits were awarded and forfeited or withheld. It is this withholding that altered penal provisions accorded by the grace of the Department of Correction in its regulations.

In addition to affecting his or her parole eligibility date, the application of K.A.R. 44-6-124 may also have an adverse effect upon an inmate's conditional release date. K.A.R. 44-6-124 provides that

"[f]or crimes, other than class A crimes, committed prior to July 1, 1993, an inmate may earn good time credits which shall be subtracted from the minimum sentence in order to establish a parole eligibility date *or the maximum sentence in order to establish the conditional release date."* (Emphasis added.)

Effective March 1, 1995, the Department of Corrections adopted K.A.R. 44-6-142 (1996 Supp.), which provided in part:

"When computing the conditional release date, it shall be presumed that prior to March 1, 1995, 100% of the available good time credits were earned. On and after March 1, 1995, good time credits shall be awarded on an earned basis pursuant to K.A.R. 44-6-124 for the purpose of determining the conditional release date."

The record is unclear whether good time credits were subtracted from the petitioner's maximum sentence prior to March 1, 1995, to establish his conditional release date based upon the withholding of 100% for his failure to participate in the SATP. What is apparent is that in April 1994, pursuant to the 1993 amendment to K.A.R. 44-6-124, 100% of the petitioner's potential good time credits (120

days) were withheld for his failure to sign an amended SATP agreement. In August 1994, another 120 days of good time credits were withheld. Sixty more days of good time credits were withheld in April 1995, and 120 days more were withheld in October 1995. In January 1996, 120 days of good time credits were again withheld.

After March 1, 1995, good time credits would no longer be presumed but would have to be earned. However, in the petitioner's case, his failure to participate in the SATP resulted in the withholding of 100% of his good time credits. Thus, what was under the regulations in existence at the time the petitioner was sentenced a presumption that he earned all good time credits available, thereby setting his conditional release date, now becomes a matter that must be earned and is subject to 100% good time credits being withheld for failure to participate in the SATP. The respondents state in their brief:

"At the time of petitioner's crime, pursuant to K.S.A. 22-3725, he was entitled to have the opportunity to be able to earn a potential total of ten (10) years of good time credit off of his sentence. The amendment to K.A.R. 44-6-124 did not change that, he still has the same amount of potential good time credit available, ten (10) years."

However, prior to the 1993 amendment, the petitioner's conditional release date was fixed by the presumption that all available good time credits were earned. This date could only be changed if he lost credits for committing offenses.

The United States Constitution's ex post facto prohibition provides: "No Bill of Attainder or ex post facto Law shall be passed." U.S. Const., art. 1, § 9, cl. 3; see art. 1, § 10, cl. 1. Its prohibition forbids legislative enactment of any law which imposes a punishment for an act which was not punishable at the time it was committed or imposes additional punishment to that then prescribed. In order for a law to be considered ex post facto, two critical elements must be present. The law must be retrospective, applying to events occurring before its enactment, and it must disadvantage the offender affected by it. *Weaver v. Graham*, 450 U.S. 24, 29, 67 L. Ed. 2d 17, 101 S. Ct. 960 (1981). In *Weaver*, the United States Supreme Court noted:

"Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense." 450 U.S. at 30-31.

Political subdivisions of a state, or quasi-legislative instrumentalities, exercising delegated legislative power are within the ambit of the Ex Post Facto Clause. 16A C.J.S., Constitutional Law § 409, p. 355. Administrative regulations adopted in accordance with the procedures set forth by the legislature have the force and effect of law in Kansas. See K.S.A. 77-425. This statute provides in part:

"Every rule and regulation other than a temporary rule and regulation which is filed by the state agency in the office of the secretary of state as provided in this act shall have the force and effect of law on and after the date prescribed in K.S.A. 77-426, and amendments thereto, until amended or revoked as provided by law and such amendment or revocation shall have become effective."

The Kansas Department of Corrections is a state agency. In adopting regulations governing the granting, withholding, and forfeiture of good time credits, it acts as a political subdivision exercising delegated legislative power. As such, its regulations adopted are within the ambit of the Ex Post Facto Clause of the United States Constitution.

Weaver addressed the question of whether a change in Florida's provisions for prison "gain-time credits" constituted an ex post facto law. The factual situation in Weaver is somewhat similar to the case at hand. Under Florida law, inmates were awarded a certain number of gain-time credits automatically simply for avoiding disciplinary infractions and for performing assigned tasks. 450 U.S. at 26. In 1978, however, the system was changed in that the number of gain-time credits awarded automatically was reduced, although extra gain-time credits were available to those inmates who performed meritorious and outstanding work. 450 U.S. at 26-27, 34-35.

The inmate in Weaver argued that this change in regulations constituted an ex post facto law, and the United States Supreme

Court agreed. 450 U.S. at 27-28. In reaching this conclusion, the Court noted that the availability of gain time is one determinant in an inmate's prison term and, thus, the prison term is altered when this determinant is changed. 450 U.S. at 32. The Court concluded that the Florida statute was applied retrospectively and further was disadvantageous to the petitioner and those persons similarly situated, saying:

"On its face, the statute reduces the number of monthly gain-time credits available to an inmate who abides by prison rules and adequately performs his assigned tasks. By definition, this reduction in gain-time accumulation lengthens the period that someone in petitioner's position must spend in prison. . . . Here, petitioner is . . . disadvantaged by the reduced opportunity to shorten his time in prison simply through good conduct." 450 U.S. at 33-34.

The Court in *Weaver* stated that it did not matter that Florida's new statutory scheme enabled the inmate to earn more good time credits through satisfying extra conditions. 450 U.S. at 35. The Court noted:

"The fact remains that an inmate who performs satisfactory work and avoids disciplinary violations could obtain more gain time per month under the repealed provision [citation omitted], than he could for the same conduct under the new provision [citation omitted]. To make up the difference, the inmate has to satisfy the extra conditions specified by the discretionary gain-time provisions. Even then, the award of the extra gain time is purely discretionary, contingent on both the wishes of the correctional authorities and special behavior by the inmate, such as saving a life or diligent performance in an academic program." 450 U.S at 35.

Accordingly, the Court found that the new regulations were ex post facto as applied to Weaver. 450 U.S. at 36.

*Weaver* was cited by the United States District Court for the Western District of Oklahoma in another case similar to the one at hand. See *Spradling v. Maynard*, 527 F. Supp. 398 (W. D. Okla. 1981). In *Spradling*, the statutes in effect prior to September 1976 provided a system similar to that in Kansas where good time credits were automatically applied to an inmate's sentence, although they could later be forfeited for disciplinary infractions. Oklahoma then amended the system to one in which the inmate was forced to earn the credits. In finding that the change constituted an ex post facto law as applied to the complaining inmate, the court stated:

"It is clear from a reading of the provisions of § 138, as they existed prior to September 8, 1976 and as they exist at this time, that the amendment of that provision in 1976 required an inmate to 'earn' credits by satisfying certain conditions, whereas previously such credits were automatic, subject only to being forfeited at a later date for disciplinary reasons. As in *Weaver*, the 1976 amendment made more onerous the punishment for crimes committed before its enactment. Thus, under *Weaver*, petitioner, and others similarly situated, are entitled to the benefits of § 138 as it existed prior to September 8, 1976, *i.e.*, the automatic "good time" credits against sentences imposed for crimes committed before September 8, 1976 . . . ." 527 F. Supp. at 404.

The petitioner's position is similar to those in *Weaver* and *Spradling*. At the time the petitioner was sentenced, he would, absent disciplinary infractions, earn 80% of his available good time credits, with the remaining 20% subject to discretionary award by the unit team manager. K.A.R. 44-6-124 (1989). While this 20% may have been forfeited for failure to participate in rehabilitation programs, no provision within the regulations in effect at the time the petitioner was sentenced related to the forfeiture or withholding of all available good time credits for such failure. These good time credits were applied to the petitioner's minimum sentence of 10 years to determine his parole eligibility date.

After the adoption of the 1993 amendments to K.A.R. 44-6-124 which expressly applied to the petitioner, 100% of the petitioner's good time credits were mandatorily withheld based upon his refusal to participate in the SATP. See K.A.R. 44-6-124(g)(6). The result in the petitioner's case was to extend the time he would have to serve before being eligible for parole. Thus, the regulation as applied to the petitioner was retrospective in that it applied to events occurring before its enactment and it disadvantaged the offender affected by it. See *Weaver*, 450 U.S. at 29.

Moreover, the 1993 amendment to K.A.R. 44-6-124(g)(6), in conjunction with the 1995 amendment to K.A.R. 44-6-142, changed the way the petitioner's conditional release date was determined. As the petitioner was convicted and began his sentence, he was presumed to earn all available good time credits or 10 years. See K.A.R. 44-6-108(c) (1989); K.A.R. 44-6-142 (1989). After the 1995 amendment he was required to earn good time credits, and his failure to participate in the SATP resulted in the loss of 100%

of his good time credits as it related to his conditional release date. The effect upon the petitioner was to extend his conditional release date based upon his failure to earn good time credits because of his refusal to participate in the SATP. Again, the regulation as applied to the petitioner was retrospective in that it applied to events occurring before its enactment, and it disadvantaged the offender affected by it. See *Weaver*, 450 U.S. at 29.

Does it matter that the 1993 amendment to K.A.R. 44-6-124(g)(6) uses the term "withholding" rather than "forfeiting"? In *Gilmore v. McKune*, 22 Kan. App. 2d 167, 169-70, 915 P.2d 779 (1995), the Court of Appeals found that there was a distinction between the withholding of good time credits and the forfeiture of good time credits, with the latter constituting a penalty but the former not doing so. The distinction by the Court of Appeals is that forfeited good time credits such as those for disciplinary actions may not be restored to the inmate while withheld good time credits may presumably be restored. However, whether the good time credits are withheld or forfeited, inmates under the prior system are still subject to a loss of such credits for their failure to participate in the SATP in that good time credits which have already been awarded to them are withheld. Therefore, as to the petitioner and others similarly situated, the Court of Appeals' decision in *Gilmore* does not apply.

The respondents argue that the recent decision of the United States Supreme Court in *California Dept. of Corrections v. Morales*, 514 U.S. 499, 131 L. Ed. 2d 588, 115 S. Ct. 1597 (1995), changes the *Weaver* analysis and, therefore, should change the result in this case. In *Morales*, the Court addressed a statutory change which lengthened the period of time between parole hearings. The Court determined that the application of the increased time between parole hearings to inmates whose crimes were committed before the change did not constitute an ex post facto violation. 514 U.S. at 514. In doing so, the Court refined the ex post facto analysis, stating that rather than focusing on whether the change in the law worked to the disadvantage of the inmate, the focus should be on whether the change alters the definition of criminal conduct or

increases the penalty by which a crime is punishable. See 514 U.S. at 506-07, n.3.

*Morales* does refine the focus of the ex post facto analysis. However, *Morales* does not compel a contrary result with regard to the award of good time credits used to calculate conditional release in this case. The effect of the 1993 amendment was to force the petitioner to earn credits he had already been awarded, and for each good time credit the petitioner failed to earn, his conditional release date and, thus, the actual term of his punishment, would be extended. Thus, even under the *Morales* analysis, the application of the 1993 amendment to those good time credits used to calculate the petitioner's conditional release date would be ex post facto.

With regard to the award of good time credits used to calculate parole eligibility, the question is much closer. In *Morales*, the Court noted that the focus should not be on whether an amendment affects a prisoner's " 'opportunity to take advantage of provisions for earlier release.' " 514 U.S. at 506-07, n.3. This would seem to suggest that if the effect of the 1993 amendment on the good time credits used to calculate parole eligibility is to merely alter the petitioner's opportunity to take advantage of provisions for early release, it does not constitute an ex post facto application of law. However, the amendment we deal with in this case goes beyond merely allowing the petitioner an opportunity to take advantage of provisions for an earlier release date. The amended regulation actually forces the petitioner to engage in the required program or risk the loss of good time credits which would automatically be earned under the old system. As a result, it has a very direct effect on the petitioner's parole eligibility and also constitutes an ex post facto application of law.

As a result, the district court was correct in determining that the application of the 1993 amendment to K.A.R. 44-6-124(g)(6) to the petitioner constituted an ex post facto application of law. The respondents' appeal must fail. Based upon our conclusion, we need not address the questions raised by the petitioner's cross-appeal regarding whether the 1993 amendment constitutes a denial of due process or a violation of the petitioner's Fifth Amendment rights.

Internal Management Procedures and Policies

The petitioner also contends in his cross-appeal that subjecting him to the IMPP 11-101 level system because of his failure to participate in the SATP violated his due process rights. In order to properly address this issue, some background on the level system created by IMPP 11-101 is necessary.

IMPP 11-101 is an internal management policy and procedure concerning offender privileges and incentives. Under IMPP 11-101, inmates can earn certain privileges, including television ownership, handicrafts, participation in organizations, use of outside funds, canteen expenditures, property, incentive pay, and visitation. Under IMPP 11-101, there are several levels of privileges. At Level I, the level at which the petitioner was placed following his refusal to participate in the SATP, the inmate may not have a personal television but has access to general television. Inmates at Level I are limited in activities, have limited expenditures at the canteen up to $20, may earn up to 60¢ per day in incentive pay, and may receive visitors from immediate family. At Level III, the highest level for inmates, the inmate may purchase a personal television, spend up to $140 in the canteen on a more extensive list of items, and may have any approved visitor.

In order to move from level to level, the inmate must remain free of class I or class II disciplinary reports and demonstrate a willingness to participate in recommended programs and/or work assignments for a full review cycle of a minimum of 120 days. An inmate may lose levels for disciplinary offenses and is automatically reduced to Level I in the event the inmate is terminated from a work program for cause, refuses to participate in a recommended program such as SATP, commits felony offenses, or has serious disciplinary offenses.

When an inmate loses levels, property items which the inmate is no longer authorized to have are removed from the facility. The first time an inmate is removed from Level II or III to Level I, unauthorized items purchased by the inmate at the canteen such as televisions, sound equipment, and large appliances are stored for the inmate at the facility and returned to the inmate when the

inmate advances back to a level at which they are authorized. However, if the inmate is returned to Level I a second time or fails to advance to Level II at the earliest possible time, these items are removed from the facility.

When an item is removed from the facility, the inmate has the choice of having the item mailed to an address of the inmate's choosing at the inmate's expense or with the approval of the warden at the expense of the facility, donating the item to charity, having the property picked up by an authorized person, or having the property delivered to a local address by the facility upon the approval of the warden. At the time IMPP 11-101 was implemented on January 1, 1996, all inmates currently incarcerated were placed at Level III, the highest level available. At this level, the inmates enjoyed the same privileges that existed prior to implementation of IMPP 11-101.

The petitioner contends that as the result of his nonparticipation in the SATP, he was made subject to IMPP 11-101 and reduced to Level I, with the result being that certain privileges and property that he had been allowed were taken away. He contends that this violated due process.

As we have already noted, the petitioner did not raise this argument before the district court. Instead, he argued that subjecting him to IMPP 11-101 was an ex post facto application which he appears to have abandoned. Ordinarily, issues not raised before the trial court cannot be raised on appeal. *Ripley v. Tolbert*, 260 Kan. 491, Syl. ¶ 6, 921 P.2d 1210 (1996). However, we have recognized an exception to this rule where consideration of the issue is necessary to serve the ends of justice or to prevent the denial of fundamental rights. See *State v. Bell*, 258 Kan. 123, 126, 899 P.2d 1000 (1995). As the due process issue raised in the petitioner's appeal is an important one, we now address it.

The first step in this analysis is to determine whether the petitioner's property interests were infringed upon. The petitioner contends that when he was reduced to Level 1, his personal property was confiscated.

The Court of Appeals has held that when inmates are afforded the opportunity to possess personal property, they enjoy a pro-

tected interest in that property that cannot be infringed upon without due process. *Bryant v. Barbara*, 11 Kan. App. 2d 165, 167-68, 717 P.2d 522, *rev. denied* 239 Kan. 693 (1986). This reasoning is sound, in that once an inmate owns certain property, the ownership of that property may not be taken from him or her without due process of law. However, there is a difference between the inmate's ownership rights in the property and the inmate's right to possess the property while in prison.

Under IMPP 11-101, when an inmate is reduced to Level I so that certain property which is in his or her possession may no longer be possessed by the inmate in prison, the property is not taken from his or her ownership. Instead, if this reduction to Level I is the first for the inmate, the property is stored at the institution until the inmate has either regained a level or failed to advance. If the inmate does regain a level, the inmate receives the property back. Otherwise, in every other case where the reduction to Level I is not the first such reduction for the inmate, the property must leave the institution. However, this does not deny the inmate ownership of the property. Instead, the inmate has the choice of having the item mailed to an address of the inmate's choosing at the inmate's expense or with the approval of the warden at the expense of the facility, donating the item to charity, having the property picked up by an authorized person, or having the property delivered to a local address by the facility upon the approval of the warden.

Courts have held that where an inmate has been allowed to send property the inmate owns but is not allowed to possess in prison from the institution to an address of his or her own choosing, the inmate has not been deprived of the property so as to implicate the due process clause. See *Williams v. Meese*, 926 F.2d 994, 998 (10th Cir. 1991); *Pryor-El v. Kelly*, 892 F. Supp. 261, 271 (D.D.C. 1995). Thus, although the petitioner was not allowed possession of the property in the case at hand, he did not lose ownership of the property, and therefore there was no taking sufficient to implicate due process.

Next, this court must address whether the restrictions imposed by IMPP 11-101 infringed upon the protected liberty interest of

the petitioner. The first question in this analysis is whether the petitioner had a liberty interest in being allowed to possess certain property or enjoy certain activities and status available to him at Level III but denied at Level I. In *Sandin v. Conner*, 515 U.S. 472, 132 L. Ed. 2d 418, 115 S. Ct. 2293 (1995), the United States Supreme Court held that while states may under certain circumstances create liberty interests, these interests will be generally limited to freedom from restraint which imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life. See *Murphy v. Nelson*, 260 Kan. 589, 600-01, 921 P.2d 1225 (1996).

The restrictions imposed at Level I do not impose an atypical or significant hardship on the petitioner in relation to the ordinary incidents of prison life. While the petitioner is denied the use of certain personal electronic equipment, this does not impose a significant hardship. Nor do the restrictions on purchases at the canteen or the types of purchases and personal property allowed constitute an atypical hardship. While Level I has a restriction on visitation, the United States Supreme Court has held that the denial of prison access to a particular visitor is well within the terms of confinement ordinarily contemplated by a prison sentence. See *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 461, 104 L. Ed. 2d 506, 109 S. Ct. 1904 (1989). Also, while Level I imposes some incentive pay restrictions, it has been held that an inmate does not have a constitutionally protected interest in employment. See *Templeman v. Gunter*, 16 F.3d 367, 370 (10th Cir. 1994). It is true that the test for whether a restriction is a significant hardship is not whether such restriction would violate due process on its own. See *Sandin*, 515 U.S. at 486. However, neither the restrictions on visitation or incentive pay constitute a significant or an atypical hardship on an inmate which would not have been contemplated in his or her original sentence.

As a result, the application of IMPP 11-101 to the petitioner does not violate due process.

Affirmed.

McFARLAND, C.J., dissenting.